We'll begin this zoom session with the case of United States versus Shea. And Ms. Tarleton, we'll hear from you first. Thank you, Your Honor. Good afternoon, and may it please the court. Jackie Tarleton for Kevin Shea. Your Honors, we've discussed in our briefs when Mr. Shea is not dangerous and no conditions should have been imposed on his release. But I'd like to spend the bulk of my time today addressing the procedure district court should follow in determining whether any release conditions at all are appropriate, and if so, which are authorized by statute. We are asking this court to follow the straightforward and correct statutory interpretation of the 11th Circuit as set forth in the United States against Crate 603, F-3rd, 1237. First, the Adam Walsh Act requires immediate discharge of detainees who will not be sexually dangerous to others if released unconditionally. And that's from 18 U.S.C. 4242E1 and also from the court's decision in Wooden. Conditional discharge is only authorized for those detainees who require medical care or treatment to keep them from being sexually dangerous. That's from this court's decision in Wooden at 609. If a prescribed regimen of medical, psychiatric, or psychological treatment or care is required to keep someone from being sexually dangerous, the statute sets forth the process that should follow. And that's at 4248 E2. First, the regimen should be prescribed, so it should originate from medical professionals or treatment providers for him, for the detainee. It should be then certified to the court by the director of the facility or the warden as appropriate, and it should be found by the court to be appropriate. This is all set forth in the 11th Circuit's well-reasoned decision in the United States against Crate, which explains that the text is clear and that no other statute authorizes any additional conditions of release to be placed on detainees. 4248 was enacted after the supervised release statute at 3583. Ms. Tarleton? Yes, Your Honor. Let me just interject at this point. I thought that the issue we're facing is whether your motion or the government's motion for release should be approved. In other words, you filed a motion on behalf of your petitioner to be released without conditions, and the government filed a motion to be released with conditions which were attached to the motion. The conditions were lengthy and they were a regimen, a prescribed procedure that was certified to by the warden, and that is attached to the government's motion. You agreed that if conditions were to be opposed, those would be appropriate. So the whole issue presented to the district court was whether release should be conditioned or not conditioned, but there was no challenge to any provision of the conditions. Those were developed at Butner and were certified to by the warden, and the judge found them appropriate, but that was not an issue presented to the court. Aren't we really faced with a single issue here now of whether this man should have been released on conditions as proposed by the government and certified to by the warden, or whether he should be released without conditions as petitioned by you? Your Honor, we believe that our challenge is fairly encompassed in our request for unconditional release, but indeed this court is bound to determine the legal standard to apply to those conditions that were imposed, and in this case we don't believe that the district court had any statutory authority to impose anything beyond a treatment regimen. What was imposed beyond the conditions proposed by the government? The government proposed a lengthy list of conditions which were developed by the staff at Butner and certified to by the warden, and as far as I can tell, maybe I'm wrong on this, those conditions were not changed by the court, were they? The only condition that was added was actually so setting that aside, nobody's objecting to that, setting that aside, the court didn't address or add to the conditions proposed by Butner and approved by the warden and advanced by the government. I'd like to clarify, Your Honor, the origin of those conditions. At JA59, the government represents that these were developed by the warden and the probation office and doesn't make any changes to the conditions that were proposed by the warden and the probation office, and as far as Mr. Smithson and Barnett were asked at the hearing, they each had reviewed the conditions, but neither said that they had been involved in creating those conditions. We cited in our reply brief two cases, Williams and Simpson, that have nearly identical conditions to those that were proposed for Mr. Shea's treatment. Well, sure it does. There's a certification on page 72, and the certification said it was, the warden says, I find the prescribed regimen of medical, psychiatric, and psychological care or treatment that has been prepared for Mr. Shea is appropriate, and that he be this is, as this list is a result of the treatment, he received at Butner. I, you know, for us to open all this up when none of this was challenged below, these were conditions, and not only that, didn't you approve these actual conditions in your response conditionally? You said if conditions were attached, they were appropriate. Didn't you say that below? The lawyer in the district court asked for unconditional release, and if conditional release is all the court would approve, agreed to conditional release. No, they agreed to the conditions. To the conditions proposed by the government. Yes, yes. But that was an alternative argument after their argument that Mr. Shea should in fact be unconditionally released. But that precisely, that's precisely my point. In the district court, your position was he'd be released unconditionally. If he's going to be released conditionally, you agreed that the conditions were appropriate. Now that ended that discussion in the district court. There was no challenge to any condition except, as you pointed out, the one added. And so I find that there's a little bit of sandbagging going on in the sense that all of a sudden on appeal, you'd read the petition, you read the condition, you say, some of them are, I can't figure out why they're relevant. Well, I must say I can find out why they're relevant if that's what, if that's our course. But these conditions are imposed very carefully. It takes medical people to understand why you have to do this or you have to do that. As you read the conditions, you can tell that. So I, I'm still questioning what's the issue before us. I thought the issue before us is whether he should be released without conditions. I think at worst, your honor, if this court were to believe that we did not preserve this argument below that this court would not decline to review, but it would in fact review for plain error. And we believe here that the error, you can't do that. Yeah. This isn't not a question of raising it. This is a question of actually agreeing to them. This is a, this is except that you wanted to add one and the court added it. Your honor, I believe that this court is bound to follow the statute. And if there's no statutory authority for the district court to impose these conditions, that this court is bound to send it back and allow the court to evaluate these questions under the proper legal standard. I don't believe. So, so as, so as I, as I view Judge Niemeyer's question is I'm not sure I'm from his perspective, what your situation is that you were saying no conditions, but in the alternative, if there are conditions, then these conditions are fine. And I think what I interpret that to mean is your argument is he shouldn't have conditions. And, and, and, but at the end of the day, if you rule against me, if you rule against me on that, then I wouldn't have a problem with the conditions. Or maybe there may be further argument, but that's, those are two separate things. If I'm understanding, I guess I read it was that the warden is not free to add conditions to a discharge and then call it a regimen of treatment. And, and it always, is that your position? Our position, your honor, is that these, this regimen of treatment should originate from and then the district court has an independent obligation also to determine that they are appropriate here. Yes, Judge Keenan. Well, you know, it, it, it all, you know, this case is always difficult because it puts us, the court and the warden, none of us are experts on this at all. I mean, he doesn't know what regimen should be used other than his experience as a warden. I'm pretty sure that we don't know which is why these cases are really difficult. I thought the issue here was a question that arose from, well, is this guy still suffering from a mental condition, a mental illness of some sort for which would require you to be able to, you know, which then authorized the court then to move forward. And that probably the main question here is, is there anything here that says this guy is suffering from mental illness? And notwithstanding, he has a history that nobody can defend. I mean, if you look at it on history alone, but the court law is pretty clear. It's not on history. The last four years, he's been doing something else. And so then it turns on not whether or not you put conditions on it and they call it regimen of care is, is really a question of, is he suffering from a am I viewing that anywhere the way you do? We do also make that argument, Your Honor. And that's, we completely agree that neither Mr. Shea does not suffer from a serious mental illness today. And he also, as a result would not be sexually dangerous if released. So if that's true, then how could you agree to conditions? If he's not suffering from a mental illness, even if you did agree, how could you do that? No one can do that. If he's, that's like seeing a guy who is not guilty. She'll go to jail for 10 years. That's exactly right. You don't have any proof at all that he's guilty without even going to trial anything on it. But that's what I kind of viewed it as the really essential issue. As I said, if you look at the history of it, Oh, that if it was just history that you would, you couldn't even walk in this in the court on this. I don't see it in the possibility of it makes the public. It is indefensible, but that's not the inquiry. The inquiry from the case law is you got to see if at the time of this, uh, this hearing, is there some evidence of this mental illness is from my perspective, but that's, that's just the way I'm viewing it. That's exactly right. Your Honor. Yes, Judge Keenan, excuse me. Okay. Ms. Charlton. Thank you. Um, I've got a couple of questions. First of all, I'm understanding your arguments are being made in the alternative. Is that correct? That's correct. Okay. And then second, I'm interested in these conditions. Is there anything in the record that shows us plate conditions applied to everyone who comes out of Butner on conditional release? And the reason why I'm asking this question, we've had this experience in the Western district of North Carolina. You may be familiar with our McMillan and those were plate conditions, not tailored to any specific individual. The court was just issuing them irrespective of the, uh, the person's record and background. So I'm wondering, does the record show whether these are boilerplate conditions or, uh, do we have any way of knowing that looking at the record in front of us? Your Honor, that's exactly one of our concerns. And at page 14 of our reply brief, we specifically cite to two cases, United States against Williams and United States against Simpson, where the conditions are very similar to those that were imposed against Mr. Shea. Excuse me, but does the record shows that I know there may be a couple other cases where the conditions are the same, but does the record show that these are boilerplate being just issued automatically in every case? Do we know that or not from the records? Well, Your Honor, I would point the court to joint appendix 339. In addition to those other conditions where, um, government council asked, um, Dr. Smithson, if the treatment team was involved in creating the conditions that were proposed to the court. And she said yes. And that they were previously involved in proposing conditions to use for a particular person, um, which suggested to me that there was some involvement by the treatment team in a generalized set of conditions, but that there was no, um, effort certainly by Dr. Smithson to prescribe specific conditions that would be tailored to Mr. Shea. And I think that's reflected in some of the nature of some of the conditions as well. Um, that there's a requirement that he provide detailed financial records. That's a JA 385. Um, there's sort of a nonsensical combination of conditions, including a curfew, GPS monitoring, and a driving log. That's at joint appendix 384. There's also severe restrictions on computer and internet access when there was no evidence of sexual misconduct by Mr. Shea connected to a computer. That's at joint appendix 388. And so one of our concerns is that there was no individualized analysis as to Mr. Shea. And this is why we raised the McMiller case in our reply brief, um, that this court has previously said that standard conditions for classes of offenders are not appropriate. Um, and we believe, even though the statutory scheme is different, that the district court's obligation to find that conditions are appropriate, um, is similarly reviewed as its obligation in the supervised release context to make sure that they're reasonably related and do not involve a greater deprivation of liberty than is necessary. Um, with respect, Judge Winn, to, um, Mr. Shea's current dangerousness, um, and his current serious mental illness, this court's decisions in Springer, Caporal, and in Wooden all affirm what Your Honor raised, which is that the question is, as of September 2019, was Mr. Shea sexually dangerous? Um, Dr. Malanick said no. Currently, he does not suffer from a serious mental illness and he's not dangerous. Why is that date important? That's the date of the challenge hearing, Your Honor. Um, and so I'm just putting us in the position of the district court at the time that it made that that Mr. Shea had not engaged in any sexual misconduct. He was not collecting any photographs. He wasn't writing any stories. He wasn't making efforts to connect with past victims or with children or even with young inmates. Um, and that's... Is this during the time, is this evaluation during the time of his treatment? Was he incarcerated during that time period? He has been incarcerated for about six years, um, and he was in treatment for four and a half of those after the district courts, um, after he agreed to commitment. Um, so during the entire six years, there was no evidence of sexual misconduct, no disciplinary infractions, no, um, no sort of behaviors that we see in some other civil commitment cases that indicate an ongoing... I mean, if we're dealing with, and I understand it, I think the law is what we are in terms of trying to understand it. I guess from my perspective, if you're dealing with a common sense application, that could give you a different result. But I just think we might be constrained by the law. I mean, we're talking about someone who's been diagnosed as a pedophile, which is described as a lifelong chronic condition, never spending a significant time, it looks like to me, in a community without something happening. I mean, if you put him back out there, it happens again. Uh, and yet, uh, you know, he's been there and all of this medical... Under the review of it, when we're looking at it, we're looking at this time period. And the question that comes up is the theory is, well, has he done anything during this time period? But he's not in the community. So how do we, how do we deal with it? I mean, I understand, I guess from the case law, it pretty much tells us that's the way we got to deal with it. That's the way I see it. I think that's right, Your Honor. And this court confirmed it wouldn't, that if, if history were to be the, the, the only guide, then anyone who had ever been committed would never be unconditionally released. But Caporale confirms that this is a decision that's made as of the time of the hearing. And here, there was no evidence of sexual preoccupation, which we do see in other cases. We see other individuals who, despite the fact that they're in prison, are engaging in behaviors that demonstrate an ongoing serious... You say no evidence of sexual preoccupation. You mean at the time of his release, none of ongoing. There's surely evidence that he is preoccupied with, with sex. I mean, if you go over the history of it, but, but you're talking about during this period of time, what now, what is the case that limits us to consider this in, in, in that time period? Not irrespective of history, but, but history not being the only factor you didn't go on. There's a number of cases, Your Honor, I'd point you to Wooden in 2018. Also this court's decision in Antone. Caporale and Springer also confirmed that the second prong, the mental illness prong, is current and forward-looking. And even if the medical literature requires a diagnosis, for example, by history, the legal inquiry is, is he now suffering a serious volitional impairment as a result of a, of a serious mental illness, disease, or defect? And I don't think that there was any evidence on this record that as of the date of the hearing, Mr. Shea was suffering from that kind of impairment. So we would ask the court to reverse the district court's judgment or at the least vacate and remand for reconsideration under the proper legal standard. We would also ask this court to give clarity to district courts in resolving these civil commitment discharge hearings. Okay, Ms. Tarleton, wasn't there an annual forensic update that Dr. Yes, Your Honor. Okay. And the report said that they, uh, had a feeling, uh, disorder within the appropriate diagnosis, right? Yes, she did say that. Okay. So, uh, I know he had problems when he, some problems that weren't directly related to problems, but, uh, rule, uh, you know, complying with rules, like he improperly traded some commissary items. He, uh, what else did he do? He bought books from a known sex offender, although apparently not sex books, um, and something about, uh, dealing with the laptop outside the rules. To what extent do we consider that as evidence, uh, regarding his ability to remain outside without conditions? I don't think that they, um, would dictate a determination that Mr. Shea is sexually dangerous. Um, they don't go to the very particular inquiry in these cases, which is whether he would have serious difficulty refraining from sexually violent conduct or child molestation if released. Right. But my question is, does this show that he will push back against rules and maybe not comply with rules? I don't think so. I don't think so, Your Honor. I think they are so limited. He never actually received a disciplinary infraction for any of these, um, transgressions. Um, they were issues that came up in treatment and this court, um, in Antone helpfully described the fact that someone who is in a mental health or an addiction type treatment program is not going to be perfect. Um, and for them to be able to, you know, have a safe space in which to make mistakes that aren't, um, sort of, you know, determinative, um, is really important and they should not be penalized in a egregious or, um, you know, over the top way for those transgressions, especially when Dr. Smithson acknowledged that Mr. Shea has learned from those experiences that when he was put in a brief treatment timeout that he responded well to that and understood that he was being held to a higher standard as someone who was in sex offender treatment. So I think his response to the, um, you know, uh, repercussions that came from those transgressions is informative and indicates that as the district judge mentioned at the end of the hearing, you know, I take you at your word and, um, I found it persuasive that you would do well whether conditions were imposed or not. Um, and I think, yes, can I ask you this? Um, uh, he was out in the community in 2013, wasn't he? That's correct. Uh, has he been in custody since that time? Since he, his supervision was revoked. Initially he was serving a revocation sentence and then he self committed for treatment. Yeah. And so since 2013, up until the time of the hearing, he was in custody, right? That's correct. So the only time that he's been in the community most recently, uh, they found that he did not handle things well. He, he had pornography. He approached this boy, paid him a hundred dollars to commit a sex act, a 16 year old. Yeah. Um, uh, So that is disputed, your honor. Well, it may be disputed, but this is what's in the psychological evaluation report, which, uh, they were relying on, uh, and, uh, that he had, uh, um, a possession of pornography, uh, and, uh, uh, half a dozen other violations of his terms of supervised release. This is in 2013. The, uh, uh, hearing what was 2018, 2019, your honor, September 2019. So, so the last time he was in the community, um, uh, we have this, uh, situation where he seemed to have been doing okay in custody, but when he was out in the community, uh, some problems arose. And so the, uh, question would naturally arise, uh, and based on Dr. Barnett's, uh, uh, comments, uh, that if he's released now into the community, uh, we can't be totally sure. And of course, these are pretty serious things. Uh, uh, he can always, uh, as the district judge pointed out, he can always, uh, ask for removal of the conditions or changes of conditions, but, uh, uh, this is a heavy record he, he, he carries. He, he's made an enormous effort and during the last five years, uh, uh, I think they recognize the enormous effort. That's why everybody is under some conditions. And what is our standard if the district court said that, uh, I conclude that conditions need to be imposed, uh, as opposed to a release without conditions is, is that a factual finding or a legal finding? I believe that's a legal finding, your honor. And this court can review for abuse of discretion. We also think that the court needs to clarify the legal standard because I don't believe that the district court was making a finding that this is a that, um, Mr. Shea was not perfect when he was incarcerated previously to this period. Um, so this is not a case like Charbonneau where it's someone who can be perfect and then really has a hard time. But to go more to the point that judge, judge Niemeyer so compellingly lays out, I'm not in disagreement where it goes with it. The problem is, is that's not standard. The standard is at the time of the hearing. And it doesn't give an exception of while you were out in the which you, you know, I probably wouldn't disagree with it if it did. Uh, and you know, your answer really is, yeah, all that's true, but it doesn't matter because the standards at the time of the hearing and the testimony then must connect to say, well, at the time of the hearing, he had a mental illness in it. And I'm not sure, maybe the other side could tell me at the time of the hearing, I'm not sure there's evidence of that. I think that's exactly in a way to me because it looks like maybe they should be, but I, I just don't see it. And I think that conclusion is bolstered by this court's decision and wouldn't in 2018, your honor. All right. Why don't we, um, uh, hear from, um, Ms. Petrie. Thank you, your honor. May it please the court. There are two issues before the court in this case. The first is whether the district court committed clearly ever confiding that Mr. Shea failed to meet his burden of proving by the preponderance of the evidence that he was no longer sexually dangerous during the hearing. So let me, let me go right to the question as judge Niemeyer sets forth, which is very, very interesting. And, and, and I think it's just, I mean, I don't know, I'm saying it's a common sense thing. There's, I think it's undisputed. This, this, uh, individual is a pedophile. He was diagnosed that in the community. He is repeatedly out there doing the same thing. If I had to make a prediction on my own, I said, he probably going to go out there and do it again. That's just my prediction. That's not good. There's nothing medical about that. I just, the feel of it. Uh, but the case law seems to say pretty convincingly that you must determine at the time of the hearing, whether he suffers a serious mental illness and answer that you can't put conditions on it. That is that correct? That's correct. Your honor. And the I know you're getting ready to go, but I want to make sure I get it. If we're there, then the question becomes, was there evidence at the time of the hearing to support what was done here? Yes, your honor. There is evidence to support that Mr. Chang at the time of the hearing suffered from a serious mental illness, abnormality or abnormality or disorder as required, um, under the statute. And what was that evidence? Because the other side said it points to the doctors, the doctors who are testifying, the hope of what, what was, what is that specific evidence at the time of the hearing that says he is seriously mentally ill? Sure. Your honor. So, so opposing counsel points to the testimony of Dr. Malnick to say that he was no longer suffering from a mental illness. However, both doctors plod and doctors Barnett that Mr. Shea at the time of the hearing met criteria for pedophilic disorder. And Dr. Barnett additionally diagnosed him with an other paraphilic disorder, not otherwise specified, which is that interest in pubescent children. And while Dr. Malnick did not diagnose at the time of the hearing, he noted that a lack of evidence in custody of someone being aroused by children does not mean that they're no longer aroused. So you are saying that it's Dr. Cloud and Dr. Barnett who says at the time of the hearing, this person here is suffering from a pedophilic disorder, which he, they would see as a serious mental illness. They testified to this. So you don't need anything more than that. Do you? If you've got two doctors who say that additional evidence, your honors, but we do have the two doctors. And what's notable about this is that they're using, they're both using the DSM five diagnoses to determine that he suffers from a condition. Now what Dr. Claude does, I think you'll see in the record is that he opines that this doesn't quite rise to the level of a serious mental illness, abnormality, excuse me, I'm sorry. I missed that one. Who did that? That was Dr. Claude, your honor. However, he said it doesn't rise to the level of a serious mental illness. Yes. However, he noted that it is a DSM five diagnosis. And I'm not aware of any case where there has been any level of structure as to what rises to the level and what does not rise to the level other than, other than an expert opinion. Other than, I mean, I don't know it and I don't know anybody knows, but he says it was his, I don't know what he meant. What did he mean when he says it doesn't rise to the level of a serious mental illness, which is the operative words here. Quite, quite frankly, your honor. It's, it's entirely unclear from the testimony. What exactly Dr. Plott meant when he said that, but what I'd point to here is that Dr. Plott did diagnose a current mental illness that is registered in the DSM five, which is pedophilic disorder here. And there's plenty of evidence, both in Dr. Plott and Dr. Barnett's reports and their testimony. And what did he base that on? Not to cut you off, did he base that on those, the information that Judge Nima points to that from 2013, he's out in the community or did he base it on these intervening six or seven years and how he is being, what's going on? I'm trying to understand that. It appears that he, he wavered a bit, your honor, based on the fact that Mr. Shea has been in custody with no, as I think opposing counsel phrases, no ongoing sexual interest, but, but that's not correct. And what I point to in the records are a few places during the course of his treatment, where Mr. Shea has said some, some pretty concerning things that indicate that while he might outwardly not be expressing an interest in children, because I think as your honor noted, there is no, there are no children within his age range in the prison. What he's doing is he's continuing to use this kind of impulsive and criminal thinking that's consistent with his prior behavior. And I think that that demonstrates through the course of the records that he does continue to suffer from this serious mental illness, abnormality, or disorder. Speaking specifically to some of his cognitive distortions, which are incredibly concerning in this case, we see that he refers to many of his victims as being damaged goods in order to justify why he was able to offend against him. That his belief was that he wasn't hurting them or harming them in any way because they came from broken family. I guess what I'm trying to understand is when you're looking at Dr. Claus and you got Dr. Barnett too, because you say he also says he's got a disorder. So maybe there's something there, but I'm, I'm trying to understand if under the case law, you can't just look at the past. You got to look at the, you know, in terms of, because there's a reason you go into treatment. I mean, if you didn't, otherwise you would never get out. I mean, we could all start out and say, this is a lifelong illness. He would never get out, you know, under that. So, so you got these experts and you have a doctor that says, well, I wouldn't see it rise a level to a serious mental illness because it's 2019. And maybe he doesn't know. Maybe for the reason that Judge Neimeyer alluded to, he's not out of the community. But the law doesn't say, that's not, that doesn't seem like to me to be standard. It could have said, you know, in the community, you know, does it apply while he's in the community? It just says him as a person, does he have this serious illness? And I'm, I don't see any direct testimony, anything even alluding to the fact that in 2019, he's in a situation where he's attracted to, let's say, pre-pubescent children. Not in 2019. I think there is evidence of this in the record, Your Honor. And what I'd specifically do is- Where is that? Where is that? Because I don't find that, that someone has said in 2019, he's attracted to these pre-pubescent children. I can't pronounce that word. I'm sorry. It's tying my tongue up. Your Honor, what I- But where is that evidence is what I'm trying to say. I didn't find it. Sure, Your Honor. What I'd point you to is actually not the testimony of one of the experts, but Mr. Shea himself at his Good Lives Plan, Joint Appendix 135, it spans several pages. And what this is, is his plan for release to the community. And he himself in several places notes that he needs to stay away from young boys because of his arousal to them, to not engage with young boys because of his arousal, to not be on the internet because of his history with them. And the fact that Mr. Shea himself recognizes that he has this arousal to children, I think is evidence of his ongoing interest in children. It sounds like to me he's recognizing the history of it, and it's good that he now understands he's got to stay away because he has this history of it. But he's not saying, I'm aroused to them now, so I'm not going to go around them. Dr. Barnett concludes it as a present time, says that at the present time he has static 99R score remains at six, which falls well above the average risk category, that he suffers a pediophile disorder, and there are currently no mitigating factors. And she lists the factors which will reduce this risk. And so it seems to me that in and of itself is sufficient to find at the present time he has a mental disorder, doesn't it? I would agree, Your Honor. And Dr. Barnett's report, I think, points specifically not only to a diagnosis of pedophilic disorder, which is relevant in this case, but also the paraphilic disorder not otherwise specified, which is also important because as recently as 2013, we know that Mr. Shea attempted to reoffend against a 16-year-old boy, and that would fall into that paraphilic disorder not otherwise specified area. And so that's what the whole point, that's the whole point is, is, you know, we're not talking about 2013, we're talking about 2019. Dr. Barnett, you know, may have testified to that, but at trial she said she didn't consider his behavior when he was in therapy. Didn't she say that? She said that specifically, says I didn't consider his behavior when in therapy. Your Honor, what I mean, just tell me where it is she says, otherwise, you know, you know, I'm just trying to understand it, but I don't see it. Sure, Your Honor. Definitely talk about 2013, definitely talk about other, she's definitely talking about that, but not when he's in therapy, and that's been six, seven years. Actually, Your Honor, in Dr. Barnett's report, located at Joint Appendix 439 through 440, um, I believe she discusses his course of treatment and provides some initial additional information, and then on page Joint Appendix 443 through 444, she specifically points that after looking at Shay's relevant history, as well as the documentation from the last year, which is the 2019 year, that part of that annual report, the diagnoses of both pedophilic disorder and paraphilic disorder remain appropriate. And the reason for that is because she has reviewed all of his information, all of that history, all that treatment information, and continues to believe that he meets criteria under prong 2 as having a mental illness, abnormality, or disorder that meets criteria under the statute. I'm just looking at a specific statement she made. She says, I didn't really look at his time while he was incarcerated or in treatment or a program where he doesn't have access to victims, but Judge Kenan has been jumping up and down, so I'm going to yield to Judge Kenan. Okay, well, I'll try to be quick here. The record showed that he had, as indicated in the testimony at the hearing, and these are questions of mine, that he had a risk factor of 6, which was above average. What is the numerical scale there? I believe the numerical scale ranges from negative 3 to approximately 12, and so he falls at a 6, which is above average in this case, and that's fairly high, and what that indicates is a static score of his offending, and so we're looking at his testimony. Did any of the doctors say that's fairly high? I think the testimony showed it was above average. It's above average, yes, and I don't know that the testimony specifically indicates that it's fairly high, but they all agree that it's above average, and in this case, when we look at someone who's above average, in compilation with his history of offenses and utilizing the factors enumerated in the United States, we see someone with some very concerning risk factors. I think Dr. Mallick... Okay, yep, I don't mean to touch off, but thank you that you have answered that question. Let's go on to the conditions here, just in case that becomes an issue in this case. Does the record show whether these are boilerplate conditions that are applied to everybody? They are not boilerplate conditions that are applied to everyone. Does the record show that? I don't believe the record specifically shows that, though Dr. Smithson, who is the treatment provider who provided treatment specifically to Mr. Shea in the Commitment and Treatment Program, notes that she was involved in developing these, and I think she was taken out of context in some of the references by opposing counsel. She was asked whether or not she had developed any plans for other individuals, which she said she had, just to show that she has experience in this area, but she was very involved in developing the plans for Mr. Shea, as noted at Joint Appendix page 353. Okay, let me not... I don't need to keep cutting back at you, but I'll just try to keep it in the area that I'm concerned with. Condition number 25B essentially says that this employer should be notified of relevant risk factors. Does that mean that any employer is notified of his task? What it means here specifically for Mr. Shea is that if he were to work for any employer, he wouldn't have to notify them of any personal risk factors of working in that position. For example, if he... What does that mean, risk factor? Are we talking about his psychological risk factors as a pedophile, that he would have to go to an employer and say... Let's just say he's working in the back room in a nursery, putting flowers together, never comes in contact with any children, and does that mean he has to tell the head of the nursery that he's a pedophile? What I think he needs to do, based on that provision, is that he needs to acknowledge that he could, in that position, come in contact with children and make the reasonable people, whether it's his employer or the employer... Let's just assume that the record would show, as a hypothetical, that he would have a job where he couldn't come in touch with children, just couldn't. Does the employer then under that is the risk specific to, from his condition, translated into the position? If there's no risks that would translate into the job, meaning that he's not going to come into contact with any children, he's not going to be crossing state lines, he's not going to be working at a school or close by a school or a park, then there's no need under this specific condition. Okay. Thank you. What I'd also add, in reference to Your Honor's question about the boilerplate conditions, I believe opposing counsel referenced several other cases where there are similar conditions. However, what I'd like to note is that both United States v. Simpson and United States v. Williams, the cases referenced, they actually had conditional release plans that came after Mr. Shea. And I offer that to show that Mr. Shea's conditions were very specific to Mr. Shea. And if we were to walk through each of the conditions and some of the conditions that noted by counsel, such as keeping a driving log, and some of the other things are specific to Mr. Shea, and they're specific to him for reasons. For example, the driving log is because he has a history of driving around and picking up children to use them as allegedly as laborers, but then sexually offending against them. So every single one of these conditions is very specific to Mr. Shea's treatment plan. What about the rationale of McMiller? You know, the conditions are reasonable, you know, generally. And if they're unreasonable, the court has ways of dealing with it when they're properly objected to. But what about the rationale of McMiller that, you know, if you're going to restrict somebody's life so much, and for good reason, you need to tell them why you're doing this? Why isn't that something that should also apply here? Not trying to divest the court of any authority, but just like when you're putting somebody on probation, a judge tells the defendant what could happen. You're informing them to help modify their behavior. Well, isn't that the same sort of thing that pertains here? That the court needs to give some sort of explanation? I don't think that the court needs to give an explanation here for a few reasons. And first and foremost, because it's not required by statute. So what 4248E requires the court do is find whether the conditions proposed by the director of the facility are adequate and appropriate. And I think the specific word used by the statute is appropriate. And so what the court did here is find that those conditions were appropriate. I note that some of the sentencing issues like in 3553 and 3583, though that section specifically requires the court to give reasons why it's imposing the conditions. But we don't see that same language here. So I think that that's an important difference. What I'd also note is while the court didn't specifically explain the reason for every single condition in this case, if we look to the court's adoption of the government's findings of fact and conclusions of law, as well as the statements made by the court at the close of the hearing, we do see a lot of rationale for the imposition of the conditions as a whole. And what the court talks about is that Mr. Shea doesn't have a good track record in the community. Yeah, excuse me. Thank you. So let's just say his counsel had objected to the conditions, what would be your position then? In other words, we agree that all of these make sense, except 25 just doesn't make sense that you have to go contact his employer. Would the court then be obligated to address? I think then if there was a specific objection, the court would probably like to hear from the parties as to the rationale behind it, why it was imposed, and how it relates to the regimen of medical, psychiatric, and psychological care. And that could have been offered specifically here. But I think as your honors noted, during the first argument, that wasn't the case here. Neither before the hearing when the conditions of release were proposed by the government, nor during the hearing, nor after the hearing, did Mr. Shea or his counsel object to the imposition of these specific conditions. And in fact, what Mr. Shea did was asked the court to add another condition. And what his condition is very specific. What he asked the court to include is that he not view adult pornography, which shows that Mr. Shea was incredibly familiar with the conditions that he had reviewed them to know that that wasn't initially included. And so he was aware of all the other conditions that were included in his release, and didn't object to any of them didn't take that opportunity to ask the court to dial them back or to change them or to change the this shows that he did consent to these conditions. And to now raise this issue on appeal, I would offer is is inappropriate. Your Honor, I see that my time has run. So I'd like to briefly take a moment to conclude and ask that this court find that the district court did not commit clear error in finding that Mr. Shea failed to meet his burden by preponderance of the evidence that he is no longer sexually dangerous and suitable for release without conditions, and also find that the district court did not abuse its discretion in imposing on Mr. Shea, a regimen of medical psychiatric and psychological care or treatment, as outlined in 18 USC 4248. Thank you, Your Honor. Thank you, Miss Petrie. This is Tarleton. You have some rebuttal. Test it, Your Honor. My apologies. That's fine. I'd like to cite the court to United States against Caporal footnote four on page 138. And that's where this court confirms that a diagnosis is only the starting point for the court to consider the true thrust of the 4247A6 inquiry, whether on a case by case basis, the respondent's underlying condition constitutes a serious functional impairment. And so that's how you could have someone who might apply the medical diagnosis of pedophilia, hebephilia, or another mental disorder, but not find that it rises to the level of a serious mental illness as required by the statute. That's United States against Caporal. Dr. Malenik said that he does not meet the criteria under prong two. That's a JA 249, 250. Dr. Plodd said no at JA 283 to 286. And Dr. Smithson and Barnett acknowledged that there was no sexual misconduct or behavior of that type while he was in prison. That's at JA 346 and JA 351. And at JA 351, I think Dr. Barnett sort of complicates her diagnosis, her current diagnosis of pedophilic disorder when she says, you know, Mr. Shea has reported being a very sexually preoccupied individual, but there wasn't really any evidence of that at all. There was no indication he was having sex with other inmates or engaging in sexual conversations. There wasn't an indication of sexual preoccupation there. So I think that that definitely decreased or improved with treatment. I also wanted to address, Judge Keenan, your question about the static 99. Dr. Malenik and Dr. Plodd both talk about this in their testimony and in their reports, but as the name indicates, that's a static indicator and its number does not change over time. And so once someone is a six, they will be a six always and forever. And so that's not really a good indicator standing alone of a current, a person's current serious mental illness or of their sexual, their serious difficulty refraining from sexually violent conduct or child molestation in the future. Let me understand what you just said. You're saying that when Dr. Barnett testified, he's a six. She could have testified about that in 2013 and the same thing would be 2025 because that's a static. But now does it go up or down? I know the word static has its meaning, but how do you get it to go up or down? That's right, Your Honor. It is static and it stays the same. There are some age related indicators that can cause it over long periods to decline a little bit. But that's why the doctors... So you're telling me this thing is like IQ? It's fixed. I won't get into, I don't know the science of IQ well enough to agree to that statement, but I will say that... But I think it's important. I think it's important because if we're relying on her, she said it was a six and we're making a big deal that, well, that's above average, he won't ever get over that. That's right. I mean, is that in the record? That's exactly right. But you're saying, what you're telling me is in the record right now? Dr. Malenik and Dr. Plodd both address it in their reports and in their testimony. And I will say that's why there's always questioning about dynamic risk factors on top of the static score. And that's where Dr. Malenik and Dr. Plodd get into the protective factors. So I'm looking specifically at Dr. Plodd at JA-288. He goes through the major protective factors. The first is his age, that he was 64 at the time of hearing and that there's an age cohort associated with almost no re-offending. Number two, he talks about how Mr. Shea self-committed and he talks about how that's a rare phenomenon. And that in the last four and a half years, he's done treatment. That's a significant period of time. He's not been terminated from treatment. He's advanced to phase four. He details all of this. And he also talks about his family support and his financial resources, which are two protective factors that most detainees in Mr. Shea's position do not enjoy. And those are in the record at JA-290. They also talk about the fact that he's not a disciplinary issue. This is, again, Dr. Plodd. He said, I think the biggest thing is something about coffee and Dr. Pepper, which I don't see as really relevant to a sexual risk evaluation. So I think it's important for this court not just to take these static indicators or historical markers in isolation, but rather to look at its decision in Wooden at 607. We quoted this at page 24 of our opening brief. To accept the government's argument would effectively mean that an offender diagnosed with pedophilic disorder could never be released as the government could always prove future impulse control problems by pointing to past failures to exercise control. And that cannot be true because the Adam Walsh Act provides an avenue of unconditional release for the appropriate detainees. And we believe that Mr. Shea is exactly one of those people. So again, we would ask this court to reverse the district court's judgment in order that Mr. Shea be unconditionally released. All right. Thank you. We appreciate your arguments. Our custom and practice, as you know, is to come down and shake your hands, greeting on behalf of the court. It's unique in this country, but the Fourth Circuit is very proud of that. We can't do that today, but we still want to greet you and thank you for your arguments. And with that, we'll proceed on to the next case.
judges: Paul V. Niemeyer, Barbara Milano Keenan, James A. Wynn Jr.